B.J. Huffsteth, Attorney for the Respondent's Appellant's Father in this case, Mr. Kirk Jay. Unlike some other cases, this is not a case of first impression and unfortunately will not be a case of last impression. I'm sorry, can you say that a little louder? Yeah. Unlike other cases you've heard this one, this is not a case of a first impression and unfortunately not a case of last impression. I don't anticipate making any compelling so-what arguments. What we're dealing with is termination of parental rights. You were obviously here for the last argument. I was, Your Honor. I was here for the last one and I'm done. Okay, we got that out of the way. We don't mind gambling. Not this panel, anyway.        Yeah. Unlike other cases you've heard this one, this is not a case of a first impression. My client admitted to that my client is the father, not the mother. My client did not, however, admit to the second allegation pertaining to unavailability to care for the minor. That went to an adjudicatory hearing in December of 2015, the result of which was a directed finding on that issue in favor of my client. Nevertheless, the minor was adjudicated to be neglected and a family service plan was created. It was created first, November 12th of 2015, filed with the court on December 16th, the same day of the adjudicatory hearing. That family service plan called for my client to complete, by my count, ten different tasks as are identified in the record. By the second family service plan, which was created in March of 2016, the Caritas Family Services caseworker had noted that my client had completed three separate assessments which he was required to perform, or to participate in, I should say, as called for by the family service plan. So that would be three of ten items had been completed in approximately three to three and a half months. My client encountered some additional issues in June of 2016, and this is all... Went to jail? He went to jail. He did. That's an additional issue. That certainly affects someone's ability to make reasonable efforts and reasonable progress. And those are two of the allegations that were ultimately in the petition for termination of parental rights. The third allegation in the... A third allegation in the petition for termination was that my client failed to protect the child from conditions within its environment that were injurious to the child's welfare. I'm sorry, I misspoke. Failed to maintain a reasonable degree of interest, concern, or responsibility. The fourth item was pled, but was ultimately found in my client's favor. So there were three bases for the finding of unfitness following the May 31st, 2017, fitness hearing. Failure to maintain a reasonable degree of interest, failure to make reasonable progress, and failure to make reasonable efforts. As to the failure to maintain reasonable interest, that's a subjective standard that is to be examined given that particular parent's circumstances. We're to focus on the reasonableness of the parent's efforts and the difficulties and circumstances that they encounter. That's important because, as we mentioned, my client went to jail. He went to jail approximately six to seven months after the child was adjudicated and neglected. Once he's in jail, certainly he's going to encounter more difficulties in maintaining any sort of interest or showing that he's maintaining any sort of interest. You can't pick up the phone, call, and check. You can write a letter. You can write a letter. That's correct. And you would agree that there's case law that says that the incarceration can be a failure to demonstrate reasonable progress? I would, yes. And I'm not arguing that there's any tolling of a nine-month period under reasonable efforts standards. But under the subjective nature of the failure to maintain interest and the subjective nature of the failure to make reasonable efforts, I do think the incarceration is something to be kept in mind when we're asking, what did this individual do? What could this individual do? Weren't there a number of incarcerations? It wasn't just one, I gathered. It was like three or four? I think the incarceration, from the time he was incarcerated in June of 2016, Your Honor, my reading of the record was that he didn't get out. Okay, so you're saying that the incarcerations, because he was at various locations, I think? That was... You're saying that all related to one conviction, is what you're saying, or several convictions that occurred simultaneously? I don't know that there are multiple convictions, but he was originally housed in Marion County Jail. The record doesn't say what the charge was, but then he goes to Grand Correctional Center in Hillsborough, and then he goes to... Marion. Danville. And Centralia, and Danville. And his time at the Centralia Correctional Center, according to his testimony, was once he got to Danville, because he was still coming back for this case while it worked its way through the trial court. They temporarily sent him to Centralia because it was closer to get him to Salem for the Marion County case than to bring him the day of from Danville. So his incarcerations all stem from one conviction? I believe so. As far as they're relevant to this case, yes, I believe so. Once he was incarcerated in June of 16, I don't believe that he got back out. Why don't you tell us what he did that would make the trial court wrong in its assessment? What are the positives that he did that should change our minds? The positives, Judge, as I mentioned, there were certain assessments that the family service plan called. I saw those. I mean, there were ten, but he only did three. Correct. What were they? The ones that he completed, the initial integrated assessments, a substance abuse assessment, and a mental health assessment, I believe. He failed to maintain contact with agency case workers, didn't make future appointments, failed to visit the minor from April 7, 2016. He was incarcerated in June. What did he do that was positive here? Well, Judge, prior to being incarcerated, I think it shows that by completing assessments, he was working on the family service plan. But the assessments, okay, and I'm sorry to interrupt you, but what I'm trying to find out is tell me what he did that made him look like a father who should have the right to come back to his child. Did he send the child birthday cards? Did he make every effort he could to visit with this boy? There was testimony that, I believe it was from Ms. Kayla Y., who works for Caritas, that he did exercise his visitation. Originally, it was scheduled for two hours per week. I believe it took place in his home. The visits were going well. He was able to provide food for the child. As Your Honor stated, there was a time when that stopped, and that would have been in I'm talking about pre-incarceration now. The fact that he was able to exercise his visitation, that things went well, that he was showing apparently the caseworker that he was able to appropriately interact and provide for the child, I think that is certainly something that... Provide for the child. For two hours, you're talking about what did he do? Meals, food, things like that. I admit it's a short time period, but that's all he had. I understand, but what did he... I mean, he didn't send the child cards, he didn't... What extra effort? Here he's looking at losing a child. What did he do to prove to the caseworkers that he was still going to be an interested, loving, supportive father? Well, I think showing that he was able to appropriately interact with the child, that he is exercising the visitations, I think... There was a time when he wasn't making the appointments. They canceled two consecutive appointments for the substance abuse assessments. They warned him about a third cancellation, a scheduled visit with a minor. He sat in his truck with another individual and didn't talk to the worker and didn't attempt to see the minor at all. That was in December of 2015, right near Christmas. So here we have a loving father sitting in his truck with some other person while his son is... I think it's his son. He's adopting his child. You know, what happens to this here? Judge, I can't stand here and say that everything he did was perfect, that he followed the family service plan to a T, but I think he did show, and I think the record shows, that interacting with the child in the times that he did, when he was... When he chose to. When he was able to, when the visits happened, there was no indication that there was anything but appropriate father-child interactions taking place. Even once he did become incarcerated, there was testimony that he contacted the caseworker asking for visits. He had his mother contact the caseworker to try to help arrange for things. The caseworker testified, actually, that once he was incarcerated, she basically stopped helping arrange for any services. Now, that's not to say that the onus is on the caseworkers, that they're supposed to make things overly simple for the parents. But if the parents are making efforts to reach out to the caseworker to try to seek some help, to try to accomplish what's in the family service plan, I would certainly expect or hope that the caseworkers would reciprocate that communication and continue to help. Okay, well, my notes indicate that as of August 23, 2016, the parents had... And this is while he's incarcerated. The parents had not participated in services, which he couldn't do, but failed to maintain contact with agency caseworkers. That's the one I'm interested in. You said they reached out to the caseworkers. This plan indicates that they didn't do that. Judge, there was testimony that's contained in the report of proceedings. Look at the page number he had. I believe it was page 137 and 138 was where my client was testifying. That's where he says that he reached out, tried contacting, had his mother try to contact the caseworker. What did he contact or his mother? Well, if he's incarcerated, it would be somewhat difficult. I believe the testimony was that he tried to, which I would assume would be via letter, but it was also that because of his limited circumstances that he had asked his mother to reach out and to contact the caseworker also. Well, moving away from what type of efforts he made just to keep contact with the child, you know, it seems to me that the major issue was the drug abuse that apparently both parents had issues with. And I don't see that he did anything but continue to abuse drugs. I mean, this is a huge long list of the two times I think it was noted that he was tested positive for amphetamines, cannabinoids, opiates, codeine, marijuana, metabolites, meth, and morphine, all in one testing. And in October, basically the same. And it shows that he refused to go to appointments and never completed any program. So how is that reasonable progress towards the return or the change of conditions that necessitated the removal? Well, during those time periods, I would have to admit that there was not, but those instances, those failed tests would not be indicative of reasonable efforts or progress. But that was also only, in other words, one test back in December of 15 when it was THC and several others that he failed. And then as you state, Your Honor, there was a second test that he failed. So before he was incarcerated, while he was still free, there were some poor choices made. Once he was incarcerated, obviously he would stop using drugs at that point. He even made a request of the trial court that was handling his criminal case, acknowledging that he had some sort of a drug problem. The request was that part of his sentence mandate that he be receiving substance abuse counseling while in prison. I don't know from the record whether that actually took place, but he does testify that once he got into the Eleanor Department of Corrections, so once he left the Marion County Jail and actually went to DOC, that he did begin seeking substance abuse counseling, that there were issues encountered with that because lack of services available to him during the four-month time that he was at Graham Correctional Center. Then from Graham he went to Danville. He was enrolling for certain classes at Danville, but because he continued to go back to Sam, for this case, he would be periodically shipped to Centralia. His testimony was that that was causing him problems with completing those classes, so even though he was technically housed at Danville and classes were available to him at Danville, because he was periodically shuttling back and forth, he wasn't actually able to complete the classes that he had enrolled in. I have one question. Sure. Is he out now? I don't believe so, Judge. Do you know when his release date is? This is not something that's in the record, but if I remember from best memory, next year, the year after, that's kind of a stretch, I guess. That's fine. I was just speaking. And I just have one other question, following up on what Justice Chapman was talking about. These December, it was in October, in a December 15 or 16, 2015 drug test. Correct. He was given the opportunity for substance abuse counseling, canceled those appointments, before he got incarcerated in June. So there was six months where he had opportunity and didn't take advantage. Do you agree with that? I agree that that's in the record, Judge. I agree with that. Okay. All right. Thank you, Justice. Thank you, Your Honors. Thank you. Thank you. Counsel? Your Honors, Counsel, and may it please the Court, Kelly Stacey appearing on behalf of the people. In this case, in order for the state to prove unfitness, it only needed to prove one ground, and here the trial court found that three grounds had been proven. Those three were respondent failed to maintain a reasonable degree of interest, concern, or responsibility as to BJ's welfare, that the respondent failed to make reasonable efforts to correct the conditions that led to the removal of BJ and failed to make reasonable progress toward the return of BJ. On appeal, the state does not take issue with the respondent's claim that he's interested in the welfare of his son and wanted to remain in his child's life. The state also does not take issue with the respondent's argument that BJ was not removed from the home due to anything he did. BJ was born with methamphetamine in his system, and that blame is placed squarely at the feet of the mother. But beyond what caused BJ to be removed in the first place is the question of what, if anything, prevented BJ from being returned to either of the two parents. And here it is very clear, just as Chapman pointed out, continued drug use was a big factor for both of the parents. And as Justice Cates pointed out, even before the respondent was incarcerated in October of 2015, he tested positive for methamphetamines, amphetamines, benzodiazepine, opiates, and morphine. And in December of 2015, he tested positive for amphetamines, cannabinoids, opiates, methamphetamines, and morphine. In his brief, the state cited NRACN, and that case is a reasonable efforts case. And NRACN holds that any issues that arise, in addition to the condition that caused the removal of the child, which would prevent the court from returning the child to the parent, those issues must also be addressed. And it's very clear here those are issues that arose with the respondent. Continued use of illegal drugs is certainly a condition that would have prevented the court from returning custody to the respondent, to the father. Respondent argues that he completed a substance abuse assessment, and while this is true, he did not complete substance abuse treatment. He did attend court hearings. He had a few visits with BJA. But the respondent used drugs, and the apparent frequency of the drug use, in addition to these were a lot of drugs in his system, in order to have BJA placed with him, he needed to get clean and stay clean. So in this regard, the court was correct in finding that the progress and efforts of the respondent were not reasonable. And the case law does make it clear that time spent incarcerated is included in the nine-month time frame under which a parent must make progress toward the return to the home of the child. And it is true here the respondent mother failed to do anything to keep the home intact either. In fact, I believe she surrendered her rights. But the fact is when you've got parents in a case, a child is removed, someone has to step up. Somebody has to do the right thing, think of the child. And that is where the maternal grandparents come in in this case. And that is the positive that I see in this case. They stepped up for BJA. This is the only placement since BJA was born September 21, 2015. It's the only placement he's ever known, the only placement he's ever been. He has his own bedroom. His grandparents are in their 40s. They're young enough to take care of him. BJA is developmentally on track. The home is safe. And the caseworker testified she thinks BJA feels safe there. As far as the, I'll step back a little bit, on the interest, concern, and responsibility, I think Justice Cates alluded to this, that even if the respondent is incarcerated, there are things that he could do. And he cited in the interest of, or in adoption of, I'm not sure how to pronounce the name, if it's sit, cite, or seek, S-Y-C-K, it says that personal visits with the child are somehow impractical. Letters, telephone calls, and gifts to the child or those caring for the child may demonstrate a reasonable degree of concern, interest, and responsibility depending on the content, tone, and frequency of the contacts and circumstances. I think here in this case it's clear the state did meet the burden of proving three out of those four allegations against the respondent. The one not proven was desertion. I think the court rightly did not find that one was proven. But I think in looking at the entire case and the adjustment BJA has been able to make to the home of his grandparents, that he's got a place where he feels loved and accepted. People believe that the manifest void of the evidence supports the court's finding. And if the court has no questions for me, the state would respectfully ask you to affirm. Thank you, Your Honors. Thank you. Counsel? Thank you, Your Honor. Just briefly, the state cites, in the case of any race, CDM, which deals with conditions that become known after the minor is removed from the parent's custody. And I agree, those after-known issues are the ones that have to be addressed. Clearly in this case that is the drug use. The two nine-month periods that were alleged, November 18, 2015, to August 18, 2016, and February 15, 2016, to November 16, 2016. So they overlap. But during those periods, admittedly, the first half was not the best, according to what's shown in the record as far as my clients, and that's due to drug problems. After June 2016, whether it was of his own choice or because he was forced to, at that point is when the record seems to reflect that he began to address his drug problem. That would be in the middle of both nine-month periods. It would be during the first nine-month period. At that point, when he at least stops taking drugs, whether it was because he had to or chose to, that would be some form of progress that would show that he is trying to correct those conditions. Are you making the argument that because he's imprisoned and presumably doesn't have access to drugs, that that shows that he is attempting to make progress towards that one goal? I'm saying that at that point he had changed, or he was no longer, he corrected the conditions, but after knowing conditions, that became aware of what CFS Caritas became aware of and was then included in the Family Service Plan. If there are no questions, that's all. I don't think so. Thank you, counsel. We appreciate the briefs and arguments. Counsel will take the case under advisement. Thank you.